**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

McKee Door Sales of Columbus, Inc.,

        Plaintiff,

        v.

Overhead Door Corp., DBA Wayne-Dalton,

        Defendant.

Case No. 2:22-cv-3927
District Judge James L. Graham
Magistrate Judge Kimberly A. Jolson

Opinion and Order

Plaintiff McKee Door Sales of Columbus, Inc. brings this action for breach of contract against Overhead Door Corporation ("ODC"), doing business as Wayne-Dalton. McKee was an authorized dealer who sold and installed commercial overhead doors manufactured by ODC. This dispute concerns allegedly defective doors installed at four sites in central Ohio. McKee alleges that its customers experienced water intrusion issues with the doors. McKee further alleges that ODC failed to fulfill its obligation to repair or replace the doors. McKee seeks to recover about $189,000, the total amount it spent on materials and labor attempting to resolve its customers' complaints.

This matter is before the Court on the parties' cross-motions for summary judgment. Because the Court finds that there is a genuine dispute of fact concerning the reasonableness of ODC's attempts to repair the allegedly defective doors, the motions are denied.

I.      **Background**

      A.      **The Parties**

McKee is an Ohio corporation which sells, installs, and services commercial overhead doors and loading dock equipment. It often serves as a subcontractor to general construction contractors. *See* Compl., ¶¶ 9–11; Girard Decl., ¶ 3.

ODC is an Indiana corporation with its principal place of business in Texas. It manufactures and sells the Wayne Dalton brand of commercial overhead doors through authorized dealers. ODC has a manufacturing facility in Mount Hope, Ohio. *See* Answer, ¶ 2.

McKee became a Wayne Dalton dealer in 1984 or 1985. According to McKee's president, Matt Girard, the companies operated together without a formal agreement or contract. They instead

1

relied on the strong business relationship they had developed over the years. *See* Girard Decl., ¶¶ 4, 6, 7.

McKee and ODC followed an established practice for handling customer complaints and warranty claims. When McKee received a complaint or claim, McKee would do a preliminary evaluation to determine if it was valid. *See id.*, ¶ 22; Girard Dep. at 146. McKee directed verified concerns to ODC's customer service department, which generated a record of the claim. *See* Currence R. 30(b)(6) Dep. at 12, 16. ODC would resolve the matter, often with McKee's assistance, by replacing or repairing the product. *See id.* at 17. Work was generally performed at the site of installation. *See* Girard Decl., ¶¶ 19, 22, 23. ODC "always made it right" and strove to resolve complaints promptly. *See* Girard Dep. at 146; Currence R. 30(b)(6) Dep. at 13. When McKee requested reimbursement for its labor charges in helping to resolve an issue, ODC would pay the costs. *See* Girard Decl., ¶¶ 17, 18; Currence R. 30(b)(6) Dep. at 18.

### B. The Invoice Terms and Conditions

At some point in time, ODC implemented an online system called Partner Connect through which dealers could receive price quotes and order doors and parts. *See* Doc. 2-4. Once a dealer placed an order on Partner Connect, an electronic invoice was generated. *See* Doc. 2-5. At the bottom of each invoice was a statement providing, "This order is subject to the terms and conditions found at: https://www.wayne-dalton.com/Documents/Invoice-Terms-and-Condtions.pdf." *Id.*

Clicking on the link at the bottom of the electronic invoice led the dealer to a one-page document entitled "Invoice Terms and Conditions." Doc. 2-3. The Invoice Terms and Conditions (the "Invoice") stated that "SELLER'S ACCEPTANCE OF THIS ORDER IS EXPRESSLY CONDITIONED UPON BUYER'S ACCEPTANCE OF ALL TERMS AND CONDITIONS HEREOF." *Id.* Among the terms were Selling Terms (all goods sold were "F.O.B. Seller's facility"), Payment Terms (cash on delivery unless credit terms were approved by Seller), and Acceptance and Contract Terms (no party "shall claim any amendment, modification, waiver, or release [from] any provisions hereof unless the same is in writing and signed by both Buyer and Seller"). *Id.*

The Invoice also included a Warranty clause, which referred to ODC's "standard limited warranty for goods manufactured by Seller." *Id.* The standard Limited Warranty issued to end-purchasers of the type of overhead doors at issue in this case was a one-year warranty against defects in materials and workmanship. *See* Doc. 2-2; Currence R. 30(b)(6) Dep. at 26. The standard Limited Warranty provided that the Seller's obligation regarding defective parts was "specifically limited to repairing or replacing, at its option." Doc. 2-2.

2

The Warranty clause of the Invoice, after making refence to the standard Limited Warranty to end purchasers, stated that the Seller's obligation was "limited to repairing or replacing, at its factory, any parts which are returned to Seller" within the warranty period and found to be defective.  Doc. 2-3.  It further provided that "labor costs are excluded."  *Id.*  And it stated that the warranty was "EXCLUSIVE AND IN LIEU OF" any implied warranties and "ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE."  *Id.*

The Invoice next provided for a Limitation of Liability, which stated that the buyer's sole recourse was limited to the Warranty provision.  *Id.*  It also provided that "IN NO EVENT SHALL SELLER BE RESPONSIBLE OR LIABLE TO BUYER . . . FOR . . . INCIDENTAL OR CONSEQUENTIAL DAMAGES."  *Id.*

### C.    The Doors Installed by McKee

All of the overhead doors at issue are Wayne Dalton Model 452 doors.  They are aluminum full-view doors, meaning the door is made of aluminum frames and clear or translucent panes.  The Model 452 is marketed as being "weather-resistant" and suitable for public buildings, such as fire stations.  Compl., ¶¶ 40–43; Doc. 50 at PAGEID 1577.

### 1.    Granville Fire Station

McKee was subcontracted to install ten overhead doors at a new fire station in Granville Township, Ohio in 2020.  *See* Curtis Decl., ¶ 5.  Once fire department personnel moved into the new station, they noticed that the doors leaked and retained water during rainfall.  *See id.*, ¶ 7.  On June 30, 2021, McKee received a video from the general contractor, Robertson Construction Services, showing water intrusion and retention problems with the doors.  *See* Locher Decl., ¶ 8.  ODC in turn was notified of the issue on July 2, 2021.  *See* Doc. 50 at PAGEID 1058.

On July 14, 2021, ODC sent representatives to Granville to attempt an on-site "field fix."  *See id.*  The field fix consisted of removing vinyl seals around the interior-facing side[1] of the glass panels, applying silicone caulk to the glass, and reinstalling the seals.  *See* Locher Decl., ¶¶ 10, 11; Curtis Decl., ¶¶ 9, 10; Doc. 50 at PAGEID 1118.

In early August 2021, Robertson notified McKee that the doors were still leaking and retaining water.  *See* Locher Decl., ¶ 12; Curtis Decl., ¶ 12.  ODC representatives visited the fire station again on August 24, 2021 to inspect the doors.  *See* Doc. 50 at PAGEID 1058.  On September 30, ODC

---

[1] By "interior-facing," it is meant that this was the side of the door facing the inside of the fire station. Thus, "exterior-facing" is the side of the door facing the outside of the station.

returned to perform another field fix, this time applying silicone caulk again and adding new vinyl seals. *See id.*; Locher Decl., ¶ 14.

The second field fix did not work, as the doors continued to leak and retain water. *See* Locher Decl., ¶ 15. ODC returned to inspect the doors on October 20, 2021. *See id.*, ¶ 16; Doc. 50 at PAGEID 1055. ODC confirmed that the doors were still leaking. *See* Doc. 50 at PAGEID 1057.

ODC internally discussed what the next step should be. Among the options considered were to "replace the sections," to "refund the money and walk away," or try "the only fix left," which involved sealing the exterior-facing side of the glass panels. *Id.* Also considered was a different model of door, including obtaining doors from a "sister brand." *See id.* at PAGEID 1059–1062. Replacing the sections had the drawback of a lengthy wait time. *See id.* at PAGEID 1057 (estimating "9-10 months to get [McKee] replacements"). ODC anticipated that a refund may not satisfy the client because of a likely higher cost to purchase the doors elsewhere. *See id.* A different model presented other challenges. *See id.* at PAGEID 1059–1062 (discussing "redesign," uncertain lead times, among other things).

ODC settled on "the only fix left." On November 19, 2021, ODC sent a letter to McKee informing them of ODC's plan. *See id.* at PAGEID 1582.[2] The letter recognized the existence of "the issue of water infiltration" but stated that no doors are truly waterproof. *Id.* ODC said that ordering replacement doors was eliminated as an option because of the long lead time. *See id.* ODC stated that it would "absorb the cost" of a repair and send a third party to perform "cap beading." *Id.* The letter explained that cap beading would involve application of a 20-year sealant to the glass panels. *See id.*; *see also* Girard Dep. at 38 (describing cap beading as "[a]n exterior caulking job on steroids to prevent water infiltration"). ODC stated that it "would like to begin the process of cap beading as soon as possible."

A December 10, 2021 letter from ODC to McKee communicated essentially the same information. ODC added that it considered the doors to be "both operational and functional and are not considered 'defective.'" *Id.* at PAGEID 1467. This letter also stated that replacing the doors with a "like set" would "most likely result in similar conditions once again reoccurring." *Id.* ODC said that it was "willing to organize and pay for" a third party to perform the cap beading. *Id.*

---

[2] The November 19, 2021 letter is addressed "Dear Sirs" without indicating to whom it was sent. Other evidence shows the letter went to McKee and possibly others involved in the situation. *See* Doc. 50 at PAGEID 1068–1070; Currence R. 30(b)(6) Dep. at 100.

Robertson and Granville declined the cap beading solution.  They had lost faith in ODC, which had already twice been unsuccessful in attempting to remedy the leaking doors.  *See* Locher Decl., ¶ 18; Curtis Decl., ¶ 13 (stating that Granville, in light of ODC's unsuccessful field fixes, "did not believe that [ODC] repairs could solve the leaks").  Robertson and Granville were also concerned that adding caulk would create a need for ongoing maintenance, including inspecting and reapplying caulk.  *See* Locher Decl., ¶ 19.  Beginning January 2022, Robertson and Granville demanded that McKee install replacement doors from a different manufacturer.  *See id.*, ¶ 20; Curtis Decl., ¶ 14.

ODC remained firm in its offered solution of cap beading.  On March 2, 2022, ODC shared with Matt Girard of McKee its test results purporting to show that cap beading was a successful solution to water leaking.  *See* Girard Dep. at 76–77, 92; *see also* Currence R. 30(b)(6) Dep. at 101 (testifying that ODC had done a small sample test of cap beading in November 2021 but did not "prove[] it out" until early 2022).  In a March 25, 2022 letter to McKee, ODC reiterated its offer to do cap beading at its cost.  *See* Doc. 50 at PAGEID 1227.  The letter stated that there would be a two month lead time in scheduling and that the cap beading process itself would take two weeks.  *See id.* ODC would perform a water spray test afterwards to test the cap beading.  *See id.*

It is unclear from the record what, if any, communications took place following the March 25, 2022 letter, other than Granville remaining of the position, vis-à-vis McKee, that the doors had to be replaced.  *See* Locher Decl., ¶ 20.  In June 2022 McKee agreed to replace the ten ODC doors at the Granville fire station with similar doors from another manufacturer, Clopay Corporation.  *See* Girard Decl., ¶ 33.  McKee ordered the doors in July 2022.  *See id.*, ¶ 34.  In September 2022, McKee installed the new doors.  *See id.*, ¶ 35; Locher Decl., ¶ 21.

McKee alleges that it expended $10,000 in labor costs attempting to help resolve the issues with the Granville doors.  It further alleges that it expended about $155,000 in materials and labor to replace the defective doors with the Clopay doors.

### 2.      Monroe Fire Station

A largely overlapping chain of events took place in nearby Monroe Township in Johnstown, Ohio.  McKee was subcontracted to install thirteen overhead doors at a new fire station in May 2021. *See* Marcoff Decl., ¶ 6.  During rainfall, the doors leaked and retained water.  *See id.*, ¶ 8.  In mid-August 2021, the general contractor, Action Contractors, notified McKee of the water infiltration issues.  *See id.*, ¶ 10; Doc. 50 at PAGEID 1443.  McKee confirmed the problem and alerted ODC on August 19, 2021.  *See id.* at PAGEID 1034.

5

ODC was already planning to return to Granville on August 24, 2021 after it learned that the first field fix there had not worked.  ODC decided to visit Monroe on the same day to inspect their doors as well.  *See id.* at PAGEID 1033, 1058.

On September 11, 2021, ODC attempted a field fix for the Monroe doors.  *See id.* at PAGEID 1038, 1058.  The field fix entailed the same process which had been tried two months earlier at Granville – removing interior vinyl seals around the glass panels, applying silicone caulk to the glass, and reinstalling the seals.  *See* Marcoff Decl., ¶ 12.

Action notified McKee on September 27, 2021 that the doors were still leaking.  *See* Doc. 50 at PAGEID 1048.  McKee soon notified ODC of the continued problem at Monroe.  *See id.* at PAGEID 1061.

By this point in time, the fire chiefs at Granville and Monroe, being in neighboring jurisdictions, became aware that they were both having water intrusion issues with ODC doors at their new stations.  *See* Girard Decl., ¶ 32.  The respective general contractors became aware of that fact too.  *See id.*

ODC returned to Monroe on October 21, 2021 to inspect the doors.  *See* Doc. 50 at PAGEID 1055.  This occurred one day after ODC had returned to Granville following the failure of the second field fix at that station.

As explained above, ODC internally debated its next step.  ODC selected cap beading and offered it as its proposed solution to both Monroe and Granville.  *See* Currence R. 30(b)(6) Dep. at 100 (confirming that the November 19, 2021 letter went to both customers).

Action and Monroe took the same position against cap beading as Robertson and Granville took.  *See* Marcoff Decl., ¶ 18.  They believed it would require ongoing maintenance of the caulk, which they had not bargained for.  *See id.*, ¶ 18; Wright Decl., ¶ 14.

On April 8, 2022, ODC sent a letter to McKee about Monroe station.  *See* Doc. 50 at PAGEID 1228.  The letter mirrored its March 25, 2022 letter to McKee about Granville.  ODC offered to perform cap beading at its cost and stated that the entire process could be completed in about two-and-a-half months, with a water spray test to follow.  *See id.*

Again, it is unclear what communications followed the April 8 letter, other than Monroe refusing the cap beading offer and demanding that McKee provide replacement doors.  *See* Wright Decl., ¶ 15.  To the present day, the original ODC doors remain in place at Monroe and water infiltration issues continue.  *See id.*, ¶¶ 16, 17.  McKee alleges that it expended $3,500 in labor costs

6

attempting to help resolve the issues with the doors and that Action has withheld nearly $8,900 in payments to McKee because of the defective doors.

### 3.  Clark-Shawnee School

A similar water intrusion issue arose at a site where McKee had installed a single ODC door. It was an elementary school in the Clark-Shawnee school district.  McKee installed the door in June 2021 and received word of a water leak in December 2021.  *See* Compl., ¶¶ 92, 93.  McKee soon attempted its own fix (adjusting brackets), which did not solve the problem.  *See* Girard Decl., ¶¶ 41, 42.  McKee notified ODC in February 2022.  *See* Compl., ¶ 96.  ODC decided to replace the leaking sections of the door, and installed the replacement sections in July 2022.  *See id.*, ¶ 102.

McKee acknowledges that ODC satisfactorily replaced the Clark-Shawnee door.  But McKee alleged in the complaint that it expended $5,000 in labor, for which ODC had failed to reimburse McKee.  Following discovery in this case, McKee admits that ODC has reimbursed it for the labor charges.  *See* Doc. 53 at PAGEID 1889 (citing Currence Dep. at 83).

Because McKee received the relief demanded in the complaint, it is no longer pursuing reimbursement with respect to the Clark-Shawnee door.

### 4.      South Central Power

The final site with water infiltration issues was a new headquarters for the South Central Power Company in Lancaster, Ohio.  McKee installed eleven ODC doors at the building in 2021.  *See* Compl., ¶ 109; Doc. 50 at PAGEID 1102.  In February 2022, McKee received notice that the doors were leaking, and ODC visited in early March to leak test one of the doors.  *See* Compl., ¶ 111; Doc. 50 at PAGEID 1123–1124.  ODC did not suggest trying the earlier field fix – caulking the vinyl seals on the interior-facing side of the glass panels – which it had attempted at the Granville and Monroe fire stations.  *See* Currence R. 30(b)(6) Dep. at 118.

On March 10, 2022 ODC proposed to McKee that it hire a third party to perform cap beading on site to one of the doors at South Central.  ODC would then perform a leak test to the door, and if the result was successful, ODC would pay to have the remaining ten doors cap-beaded on site.  *See* Doc. 50 at PAGEID 1120–1121.

The general contractor, Corna Kokosing Construction Company, posed some questions to ODC about the nature of cap beading, including whether it was creating an "external seal that may fail in time."  *Id.* at PAGEID 1119.  ODC responded with a diagram showing that the caulk would be applied to close a gap between the glazing tape, which adheres to the bottom of each glass panel, and

the inside rail of the aluminum frame in which the bottom of the glass panels rest.[3] *See id.* at PAGEID 1118.  Though the caulk would be on the exterior-facing side of each door, ODC described the fix as "internal" in the sense that the caulk would be recessed behind a lip in the frame.  *Id.*

Corna agreed to ODC arranging to perform a cap beading test on one of the doors.  *See id.* at PAGEID 1115–1116.  South Central was satisfied with the results of the test and approved cap beading for the rest of the doors, and work was completed in May 2022.  *See id.* at PAGEID 1101–1102.

The complaint alleged that it was "unclear" whether cap beading had been successful at South Central and represented a satisfactory repair.  The complaint further alleged that McKee was still owed $7,500 in unpaid labor charges.

Following discovery, McKee does not dispute that South Central has not made a complaint to McKee about any further water intrusion issues.  *See* Girard Dep. at 32–33, 151.  McKee also acknowledges that ODC has reimbursed it for the labor charges.  *See* Doc. 53 at PAGEID 1890 (citing Currence Dep. at 83).

Because McKee received the relief demanded in the complaint, it is no longer pursuing reimbursement with respect to the South Central doors.

### D.      The Claims and Counterclaim

The complaint asserts two claims, with the first being for declaratory judgment.  McKee seeks a declaration that the Invoice Terms and Conditions do not govern the parties' relationship.  McKee alleges that the parties' course of dealing and course of performance govern their relationship.  Alternatively, it argues that the terms of the Invoice were waived by ODC by its conduct in attempting to repair the doors at Granville and Monroe.  McKee also argues that the terms of the Invoice failed of their essential purpose and are unenforceable.

The complaint also asserts a claim for breach of contract.  McKee alleges that the doors installed at the Granville and Monroe fire stations were defective.  It further alleges that ODC failed within a reasonable time to deliver, through replacement or repair, doors which were free of defects.  McKee asserts that ODC is liable to reimburse McKee for the cost to cover the defective doors in Granville, for the payments withheld by Action on the Monroe job, and for the value of its labor at both sites.

---

[3] Glazing tape is also called very high bond or "VHB" tape.  *See* Doc. 50 at PAGEID 1118.

ODC has brought a counterclaim against McKee for breach of contract. ODC alleges that in February 2022 it supplied an order of doors and parts to McKee. This order was unrelated to the four projects described above. ODC submitted an invoice in the amount of $165,788 on March 9, 2022, but McKee has failed to pay.

In its answer to the counterclaim, McKee admits that ODC supplied non-defective goods pursuant to the March 9, 2022 invoice and that McKee has failed to pay the billed amount. McKee, however, asserts that it has a right to offset its damages arising from the Granville and Monroe orders by withholding payment to ODC on the March 9, 2022 invoice.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all

facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## III.   Discussion

### A.   Choice of Law

The Invoice contains a choice-of-law provision selecting Texas law to govern the transaction. *See* Doc. 2-3. McKee denies that the Invoice controls and argues that Ohio law applies because the goods were sold and delivered for use in Ohio. The Court, however, need not select which state's law applies because both Texas and Ohio follow the same Uniform Commercial Code provisions and legal principles which govern the issues presented in this case. *See* Tex. Bus. & Com. Code Chapters 1, 2; O.R.C. Chapters 1301, 1302. For simplicity's sake, the Court will cite Ohio law.

### B.   ODC's Obligation is to "Repair or Replace" No Matter Whether Course of Dealing/Performance or the Invoice Controls

McKee moves for summary judgment on its declaratory judgment claim. It argues that the parties had a course of dealing long before ODC implemented Partner Connect, which purported to impose the Invoice Terms and Conditions when an order was placed. *See* O.R.C. § 1301.303(B) (UCC § 1-303) (defining a "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct"). McKee further argues that the parties engaged in a course of performance which varied from, and trumped, the Invoice. *See id.*, § 1301.303(A) (defining a "course of performance" as "a sequence of conduct between the parties to a particular transaction" which "involves repeated occasions for performance by a party" and for which the "other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection"). McKee contends that under either their course of dealing or course of performance, ODC had an obligation to replace or repair doors at the customer's site and to reimburse McKee for its labor charges. McKee adds that to the extent the Invoice governs, ODC caused those terms to fail of their essential purpose by refusing to satisfactorily repair or replace the doors at the Granville and Monroe fire stations.

10

ODC moves for summary judgment as well.  It argues that the express terms of an agreement control unless they are ambiguous.  *See Sutton Bank v. Progressive Polymers, L.L.C.*, 161 Ohio St. 3d 387, 392–93, 163 N.E.3d 546, 553 (Ohio 2020).  According to ODC, the Invoice terms are clear and unambiguous and the Court should not resort to considering the parties' course of dealing or course of performance in interpreting their meaning.  *See* O.R.C. § 1302.05(A) (UCC § 2-202).  ODC further contends that it did not waive the Invoice terms, nor did the Invoice terms fail of their essential purpose, because ODC made reasonable and good faith efforts to repair the Granville and Monroe doors.  ODC argues that it was not at fault for its repair efforts coming to an end.

The Court finds that it is unnecessary to resolve now the issue of whether course of dealing/performance or the Invoice governs.  Under the Invoice, ODC's obligation with respect to a defective good was to repair or replace.  *See* Doc. 2-3.  McKee argues that under the parties' courses of dealing and performance, ODC's obligation was to promptly "make things right."  *See* Girard Dep. at 146; Currence R. 30(b)(6) Dep. at 13.  *See also* Compl., ¶ 45 (alleging that when McKee's customers had problems with ODC doors, ODC would "resolve[] problems efficiently and effectively").  McKee's president agreed in his deposition that during the parties' decades-long relationship, the expectation of how ODC would respond to a defective good was no different that its "repair or replace" duty under the Invoice.  *See* Girard Dep. at 147.

One potential discrepancy between course of dealing/performance and the Invoice is the location where repairs and replacements take place.  McKee says that ODC made onsite repairs and replacements at the customer's location.  *See* Girard Decl., ¶¶ 19, 22, 23.  The Invoice states that defective parts are to be returned to ODC.  *See* Doc. 2-3.  However, this discrepancy does not alter the analysis.  It is undisputed that ODC representatives traveled to Granville and Monroe numerous times to attempt to repair the doors.  It is also undisputed that ODC offered to continue the repair efforts by paying to send a third party to Granville and Monroe to perform cap beading.  *See* Doc. 50 at PAGEID 1227, 1228, 1467, 1582.  Even accepting McKee's position that course of dealing/performance governs, it cannot be said that ODC breached its duty to repair or replace by refusing to perform a repair on site or by requiring that parts be returned to ODC at the buyer's cost.

Thus, regardless of whether ODC's duty was imposed by course of dealing/performance or by the Invoice, its obligation was to repair or replace defective goods.  And the resolution of whether ODC satisfied its duty will in turn determine if McKee can recover its alleged damages from ODC.  With respect to Granville, McKee alleges that ODC is liable for the $155,000 McKee spent to cover by obtaining new doors and that ODC is also liable for $10,000 in labor which McKee expended in

helping to try to repair the defective ODC doors.  With respect to Monroe, McKee alleges that ODC is liable for the $8,900 withheld by Action from McKee for ODC's failure to remedy the defective doors and that ODC is also liable for $3,500 in labor costs.

If the sales are governed by course of dealing/performance and if McKee can prove that ODC breached its duty to repair or replace within a reasonable time, then McKee is entitled both to exercise the right of cover and to recover incidental and consequential damages.  *See* O.R.C. § 1302.86 (UCC § 2-712); O.R.C. § 1302.89 (UCC § 2-715).  If the Invoice governs the sales, McKee is still entitled to cover and to incidental and consequential damages if it can demonstrate that ODC refused to repair or replace the defective doors within a reasonable time.  In such a case, the Invoice's limitation on remedies will have failed of its essential purpose and the UCC's full range of remedies will be available.  *See Goddard v. Gen. Motors Corp.*, 60 Ohio St. 2d 41, 45, 396 N.E.2d 761, 764 (Ohio 1979) (where the buyer is "deprived of the benefits of the limited remedy" – such as when a seller is "unable or unwilling to repair or replace a defective part within a reasonable time" and the buyer is left with a defective product – the exclusion of remedies has failed of its essential purpose and the UCC's remedies are available); O.R.C. § 1302.93(B) (UCC § 2-719) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [Chapter 1302]."). *Accord Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 55–56, 537 N.E.2d 624, 639–40 (Ohio 1989).

All of this is to say that resolving whether the course of dealing/performance or the Invoice governs has little or no impact on the outcome of the case.[4]

**C.     Breach**

To establish a breach of warranty (regardless of whether the warranty arises from course of dealing/performance or the Invoice), McKee must establish that: (1) the goods are nonconforming; (2) ODC was given a reasonable opportunity to cure the defects; (3) and ODC failed to repair or

---

[4] There is a scenario in which McKee could recover its labor costs even if ODC did not breach a duty to repair or replace.  McKee claims that the parties followed a practice of ODC reimbursing McKee for labor charges when requested to do so.  This practice was followed in the Clark-Shawnee and South Central situations.   If course of dealing governs, then McKee would be entitled to reimbursement even if ODC did not breach its duty to repair or replace.

Even so, because the labor costs represent such a small percentage of the total damages sought and because a finding that ODC breached its duty to repair or replace would moot the point, the Court finds this scenario to be an insufficient reason to resolve the difficult issue of whether course of dealing/performance or the Invoice governs.

replace the defective goods within a reasonable time or within a reasonable number of attempts.  *See Malkamaki v. Sea Ray Boats, Inc.*, 411 F.Supp.2d 737, 743 (N.D. Ohio 2005).  *See also Abele v. Bayliner Marine Corp.*, 11 F.Supp.2d 955, 960 (N.D. Ohio 1997) ("The purpose of an exclusive remedy by the seller to repair or replace the defective parts is to give the seller an opportunity to cure the defect: to make the goods conform while limiting risks by excluding direct and consequential damages.").  For the purposes of the cross-motions for summary judgment, ODC assumes but does not concede that the doors were defective.

There is no dispute that ODC received notice of the alleged defects with the doors at both Granville and Monroe stations.  *See* Doc. 50 at PAGEID 1034, 1058.  ODC was allowed on site to inspect and attempt a field fix at both locations.  *See id.* at PAGEID 1033, 1038, 1058.  So, ODC at least initially had a reasonable opportunity to cure the defects.  *See Abele*, 11 F.Supp.2d at 960 (seller must receive notice of a claimed defect and a chance to cure).

The crux of this case is whether ODC's repair attempts and its proposed cap beading solution were reasonable in their nature and timing.  These sorts of determinations are context-dependent and generally are questions of fact for the jury.  *See Chemtrol*, 42 Ohio St.3d at 56, 537 N.E.2d at, 639–40 (Ohio 1989); *Boyas Excavating, Inc. v. Powerscreen of Ohio, Inc.,* 139 Ohio App.3d 201, 212, 743 N.E.2d 464, 472 (Ohio Ct. App. 2000); *Kabco Equip. Specialists v. Budgetel, Inc.*, 2 Ohio App. 3d 58, 61, 440 N.E.2d 611, 614 (Ohio Ct. App. 1981); *General Motors Accept. Corp. v. Grady*, 27 Ohio App.3d 321, 324, 501 N.E.2d 68, 71 (Ohio Ct. App. 1985); *Lilly, Jr. v. Hewlett-Packard Co.*, No. 1:05-CV-465, 2006 WL 1064063, at *2 (S.D. Ohio Apr. 21, 2006).  Many factors can come into play for the factfinder to consider: the intended purpose, use, value, and safety aspects of the good; the nature and severity of the defect and how the usefulness of the good is impacted by the defect; the relative cost and complexity of the repair options; the cost and complexity of replacement; the particular needs and situation of the customer; the burdens imposed on the customer by the good's defect; and the burdens imposed on the customer by the various repair and replacement options.  *See, e.g., Boyas Excavating*, 139 Ohio App. 3d at 212, 743 N.E.2d at 471–72; *General Motors*, 27 Ohio App.3d at 323, 501 N.E.2d at 71; *Malkamaki*, 411 F.Supp.2d at 745; O.R.C. § 1301.205(A) (a "reasonable" amount of time "depends on the nature, purpose, and circumstances of the action").

A review of the record shows that there are genuine issues of material fact which preclude summary judgment on the issue of the reasonableness of ODC's response to the water infiltration problems with the doors it sold to McKee.  As an initial matter, there is conflicting evidence about

how serious the infiltration issues were.[5]  In declarations submitted by McKee, the doors are said to have leaked "in unacceptable quantities and volume" even with just "a modest rain."  *See* Locher Decl., ¶¶ 6, 7; Curtis Decl., ¶¶ 6, 7; Marcoff Decl., ¶¶ 7, 8; Wright Decl., ¶¶ 6, 7.  ODC representatives, in contrast, described the leaks as not "excessive" and suggested that there had been an overreaction to the leaks.  *See* Doc. 50 at PAGEID 1034.  The terms "unacceptable," "modest," and "excessive" are best evaluated by the factfinder in the context of all of the evidence presented at trial, and not by the Court at summary judgment.

The water leaks were said to have caused water to spill or drip on firefighting equipment, personnel, and the station floors.  *See* Curtis Decl., ¶ 7; Wright Decl., ¶ 8.  But there is no further description of the cost or burden of the defective doors to the fire stations or their operations.

There is also relatively little information about what ODC discovered or did during its visits to Granville and Monroe in July and August 2021.  McKee and ODC confirmed through water spray tests that water infiltration was occurring.  *See* Girard Dep. at 28, 30, 31.  But it is unclear what, if any, further inspection efforts took place to determine the cause of the leaks.  A jury could find that a reasonable seller in ODC's position would have taken such steps.

On the other hand, there is evidence that ODC had received prior complaints from customers about water leak issues with its aluminum full-view doors.  *See* Doc. 50 at PAGEID 1012.  In response, ODC developed the solution known as the field fix.  This involved the removal of vinyl seals on the interior-facing side of the glass panels, application of silicone caulk to the glass, and reinstallation of the seals. *See id.* at PAGEID 1027; Currence R. 30(b)(6) Dep. at 88.  There is evidence that the field fix was ODC's standard first step in addressing water infiltration issues with aluminum full-view doors. *See*, *e.g.*, Currence R. 30(b)(6) Dep. at 72, 88.  From this, a jury could find that ODC's attempted field fix was reasonable.  *See* Girard Dep. at 46 (testifying that the field fix worked for one of its other customers in August 2021).  At the same time, McKee has submitted evidence that ODC knew or should have known, based on the results of ODC's own testing, that the true cause of the leaks would likely be the exterior-facing glazing tape and that the field fix was not the appropriate solution in all cases.  *See* Doc. 53 at PAGEID 1878–1884.  Depending on how much inspection and testing ODC

---

[5]  For purposes of the motions for summary judgment, the Court assumes that the doors were defective even if the water leak issues are viewed in the least-problematic light.

did of the doors at issue, a jury could plausibly find either that it was reasonable or that it was not reasonable for ODC to attempt or repeat the field fix.[6]

Several months passed and, after a total of three failed attempts with the field fix, ODC returned on October 20 and 21, 2021 to Granville and Monroe. ODC confirmed that the doors were still leaking. It is unclear whether ODC performed any further inspections or tests to attempt to determine why the field fixes did not work. A jury could find that ODC should have. But it should be noted that by early October ODC had already begun consulting with a glass company, Wooster Glass, to get their expertise on how to create an exterior seal "to prevent water from even being able to penetrate through the glass." Currence R. 30(b)(6) Dep. at 91. A jury could view this step as reasonable and any inaction by ODC on October 20 and 21 as understandable if ODC was awaiting guidance from Wooster Glass.

Wooster Glass is the one who recommended the cap beading solution to ODC. *See id.* at 91–92. It is unclear on what basis Wooster Glass made the recommendation, again underscoring how muddy the waters are at the summary judgment stage. A factfinder may wish to know if Wooster Glass had successfully used cap beading in the past to solve similar water infiltration issues, if cap beading had been used by others in the industry, or if it was an entirely new idea, and if so, why Wooster Glass or ODC had reason to think it would work on the doors at issue. In its briefs, McKee characterizes cap beading as "untested" but does not cite evidence which supports its assertion. *See* Doc. 53 at PAGEID 1889; Doc. 60 at PAGEID 2330, 2332.

By the time ODC sent the November 19, 2021 letter to McKee proposing that the doors be cap beaded, ODC and Wooster Glass had done a small sample test of cap beading but had not "proven it out." Currence R. 30(b)(6) Dep. at 101. ODC did not prove out the process to its satisfaction until January and February of 2022. *See id.* at 101–102. A jury could find that ODC should have acted more quickly in confirming that cap beading would work to solve the water infiltration issues. In October 2021, the fire chief at Monroe had raised his concern to McKee about ice forming in the doors during winter, but it is unclear if McKee relayed his concern to ODC. *See* Doc. 50 at PAGEID

---

[6] An added consideration for the factfinder is that ODC made other adjustments to the doors in Granville and Monroe. *See* Doc. 50 at PAGIED 1056 (hinge adjustments); *id.* at PAGEID 1058 (at Granville, gap and track adjustments); Currence R. 30(b)(6) Dep. at 110 (at Monroe, ODC put in "joint seals" and made sure that "the foam tape was in place"); Doc. 50 at PAGEID 1030, 1038 (at Granville, "foamstop" added to the tops of the doors and "new foam tape" to the joints of each section). There is not enough information on the record to assess the reasonableness of these efforts and their interplay with the other repairs.

1459. At the very least, his concern was communicated to ODC in mid-January 2022. *See id.* at PAGEID 1275–1276. Even so, a jury could find that it was reasonable for ODC to want to prove out cap beading before performing it at Granville and Monroe. A jury could find that the lapse of time was not unreasonable if they believed that the customers were overreacting and if they credited the evidence suggesting that cap beading could not have been performed during the winter anyhow because temperatures needed to be above 50 degrees for the sealant to cure. *See* Currence R. 30(b)(6) Dep. at 107.

On March 2, 2022, ODC shared with McKee what it says was proof that cap beading would work. *See* Doc. 50 at PAGEID 1299, 1473–1479. ODC followed up by offering again to perform cap beading at its cost, conduct water spray tests afterwards, and provide a two year warranty on the cap beading. *See id.* at PAGEID 1227–1228; Kornish Dep. at 118. A jury could find that ODC had worked diligently to find an appropriate solution, that its offer was reasonable, and that it stood ready to repair the defects in a satisfactory manner and time. *See* Doc. 53-6 at PAGEID 1946 (expert report concluding that the glazing tape was the cause of the water leaks). A jury could find that the customers were too hasty in their rejection of ODC's offer. *Cf. Malkamaki*, 411 F.Supp.2d at 745 (a seller is afforded a minimum of two attempts to cure a defect under the Magnuson–Moss Warranty Act); *Clayborne v. Mercedes-Benz USA, LLC*, 2025-Ohio-283, ¶ 41, 262 N.E.3d 633, 644 (Ohio Ct. App. 2025) (seller gets three repair attempts under Ohio's Lemon Law).

At the same time, a jury could conclude that ODC took too long and that the customers acted reasonably in refusing ODC's offer. A jury could take the view that Granville and Monroe had endured numerous site visits and repair attempts which did not address the true cause of the leaks. The general contractors and customers also believed that cap beading would create a need for ongoing maintenance which they had not bargained to take on. Under this view of the evidence, a jury could find that the customers, having become understandably frustrated and distrustful of ODC and stuck with defective doors for many months, were justified in refusing ODC's proposed solution. *See Abele*, 11 F.Supp.2d at 960–61 ("The right to cure has limits, however: the buyer is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty. . . . [T]he exclusive remedy of repair and/or replacement of defective parts fails of its essential purpose if, after numerous attempts to repair, the boat does not operate free of defects.") (internal quotation marks and alterations omitted); *Lilly,* 2006 WL 1064063, at *2 ("What is a reasonable period of time for the seller to cure defects is generally a question of fact. . . . A seller does not have unlimited time to cure non-conformities, nor does a buyer have to keep complaining

16

forever.") (internal quotation marks omitted); *McCullough v. Bill Swad Chrysler-Plymouth, Inc.*, 5 Ohio St. 3d 181, 186, 449 N.E.2d 1289, 1294 (Ohio 1983) (discussing a situation that "shakes the buyer's faith or undermines his confidence" in the seller and where the seller is "proved incapable of curing [the good's] defects").

In sum, the Court finds that the issue of whether ODC reasonably attempted to cure the defects with its doors at Granville and Monroe stations cannot be resolved at summary judgment and is one for a jury to decide.

## IV.     Conclusion

Accordingly, the parties' cross-motions for summary judgment (Docs. 52, 56)  are DENIED.


                                                   *s/ James L. Graham*
                                                   JAMES L. GRAHAM
DATE: March 18, 2026                               United States District Judge